

NUMBER 13-10-00214-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**LUCIANO BALADEZ,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

## On appeal from the 24th District Court
## of Victoria County, Texas.

---

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Memorandum Opinion by Justice Garza**

A jury convicted appellant, Luciano Baladez, in Count One of retaliation, enhanced to a second-degree felony, *see* TEX. PENAL CODE ANN. §§ 36.06, 12.42(a)(3) (West Supp. 2010), and in Count Two, of aggravated assault, enhanced to a first-degree felony. *See id.* §§ 22.02(a)(2), 12.42(b). The jury assessed punishment at ten

years' imprisonment plus a $1000 fine and court costs for Count One, and thirty-three years' imprisonment and a $3,000 fine for Count Two, with the sentences ordered to run concurrently.  By a single issue, appellant contends the evidence is legally insufficient to support his conviction for aggravated assault.  Specifically, appellant contends the evidence is insufficient to establish that he threatened the victim with imminent bodily injury or that he used or exhibited a deadly weapon during an assault of the victim.  We affirm.

## I. BACKGROUND

### A. State's Evidence

Around midnight on September 6, 2009, Andrew Rojas Sr. ("Rojas") and his son, Andrew Rojas Jr. ("Andrew"), were barbequing outside their home in Bloomington, Texas.  Rojas noticed someone, later identified as appellant, near a storage shed on his elderly neighbors' property.  Rojas went to investigate.  The events that followed were disputed at trial.  We detail below relevant testimony presented by some of the witnesses.

### 1. Rojas

Rojas testified that while outside barbequing, he saw appellant looking through the windows of a storage shed on property belonging to Rojas's neighbors, the Kings.  Rojas observed appellant set down a beverage he was carrying and urinate near the storage shed.  Suspecting that appellant did not "belong there," Rojas went to investigate.  Andrew, who was in the restroom, did not go with him.  As Rojas approached, he saw appellant attempting to open the lock on the Kings' storage shed with a knife "about 12 inches long."  Rojas asked appellant what he was doing;

2

appellant said, "nothing." When Rojas accused appellant of trying to open the door, appellant's tone of voice "changed"; he turned toward Rojas, saying, "I told you I didn't do a fucking thing." When appellant turned, Rojas testified he was in "imminent fear" that appellant would harm him. Rojas grabbed appellant's hand and wrestled him to the ground. When appellant hit the ground, he released the knife. Rojas saw Andrew running toward them with a cell phone. As Rojas and appellant continued to wrestle, appellant kept trying to reach for the knife. Appellant told Rojas that if he called the police, appellant would come back and kill him and his family. Rojas directed Andrew to move the knife out of appellant's reach and call the police.

On cross-examination, defense counsel asked Rojas if he had been drinking. He said he had consumed two beers at the most.

## 2. Andrew

Andrew testified that he and Rojas noticed appellant on the Kings' property. After Andrew came out of the restroom, he followed Rojas to the neighbors' property. Rojas already had appellant on the ground and told Andrew to call the police. Andrew did not have his cell phone with him; he returned to the house and woke his wife, who called the police. While waiting for the police to arrive, Andrew knocked on the neighbors' door, but they were not home. Andrew then woke another neighbor, Myron Charleston. While waiting for the police to arrive, Andrew heard appellant threaten to kill Rojas for not letting him go. Andrew identified the knife that was involved in the incident.

On cross-examination, Andrew said that on the night of the incident, he had consumed one beer. By the time he arrived at the Kings' property, Rojas had appellant

3

pinned down.  Andrew did not see appellant attempting to pry the door open and did not see appellant holding the knife.

### 3. Maria Rojas

Maria testified that on the night of the incident, Andrew awoke her and told her to call 911.  She did so; at some point, she handed the phone to Andrew to report the incident.

### 4. Myron Charleston

Charleston testified that he lived near his cousins, the Kings, and Rojas.  Around midnight on the night of the incident, Andrew awoke Charleston by banging on his door.  Charleston went with Andrew to the Kings' property, where Rojas had appellant pinned down.  Charleston heard appellant threaten Rojas that he would come back and kill him.  Charleston also saw the knife that had been kicked aside in the scuffle and identified it at trial.

### 5. Officer Robert Ontiveros Jr.

Robert Ontiveros, a patrol sergeant with the Victoria County Sheriff's Office, testified that he and Deputy Leticia Guajardo responded to the 911 call.  He interviewed Rojas, Andrew, and Charleston at the scene.  Officer Ontiveros identified the knife, which was recovered on the ground near the storage shed; no firearms or other weapons were present.  Officer Ontiveros identified appellant as the person apprehended at the scene and testified that appellant did not have a reputation for being law-abiding and honest.

On cross-examination, Officer Ontiveros testified that when appellant was arrested, he did not appear to be injured but did appear to be highly intoxicated.

4

## 6. Officer Leticia Guajardo

Officer Guajardo testified that she was dispatched to the Kings' property the night of the incident and interviewed Rojas, who described what had transpired. Officer Guajardo stated that the level of force that Rojas used in restraining appellant appeared to be reasonable and that she did not observe any injuries to appellant. She confirmed that appellant has a reputation for not being law-abiding and truthful.

## B. Defense Evidence

## 1. Angela Martinez

The defense called Angela Martinez, the Victoria County Sheriff's Office investigator assigned to appellant's case. Defense counsel asked Martinez whether she investigated to determine whether the knife used in the incident could have been belonged to the Rojas family. Martinez responded that she had not because she accepted Rojas's account of the incident.

On cross-examination, the prosecutor asked Martinez whether she would be in "immediate fear of bodily injury" if he held the knife up and "looked like [he] was going to use it on you"; Martinez responded that she would be. She also stated the knife could cause serious bodily injury and that it was an effective knife for cutting or stabbing. Martinez also confirmed that appellant's booking photograph does not show any evidence of injuries.

## 2. Jason Rivera

Rivera, who lives near the King property, testified that on the night of the incident, appellant was visiting with him outside until around midnight. Rivera did not see that appellant was carrying a knife like the one admitted in evidence. Rivera said he sat

outside for awhile after appellant left, but did not hear or see the police arrive at the King property.

On cross-examination, Rivera admitted he was currently incarcerated on a charge of possession of certain chemicals with intent to manufacture methamphetamine. He also admitted to a conviction for felony possession of marijuana and convictions for theft and evading arrest.

### 3. Appellant

Appellant testified that when he left Rivera's house, he was walking home, which was about seven blocks away. He said that he was on the King property, but stopped to "take a leak." He testified that he had a pocketknife in his pocket, but denied that the knife recovered in the incident was his. Appellant said that Rojas and Andrew approached him and accused him of attempting to break in. He said both Rojas and Andrew were drunk and that Rojas told Andrew to go get a shotgun. According to appellant, Rojas hit him and jumped on top of him. While Rojas was hitting him and hurting his back, Andrew returned with a shotgun and threatened to shoot him. Appellant admitted that he had been in prison on a charge of retaliation on a police officer. Appellant said that he was "jumped" by Rojas and Andrew, and that he suffered bruises as a result.

On cross-examination, appellant said he did not have an opportunity to tell the police that he was assaulted because they did not want to hear his side of the story. Appellant admitted that he had an extensive criminal history, including numerous convictions for evading arrest, theft, and burglary. State Exhibits 18 through 26 were admitted, which consisted of appellant's misdemeanor convictions. The State also

admitted evidence of the third-degree felony retaliation offense. With respect to the retaliation offense, appellant denied that he threatened to kill a police officer.

As a rebuttal witness, the State called Thurman Marshall, the officer that appellant was convicted of threatening. Officer Marshall testified that in 1993, appellant threatened to kill him and his family; appellant was convicted of retaliation for the offense.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

The court of criminal appeals has recently held that there is "no meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* factual-sufficiency standard" and that the *Jackson* standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 902–03, 912 (Tex. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Accordingly, we review claims of evidentiary sufficiency under "a rigorous and proper application of the *Jackson* standard of review." *Id.* at 906–07, 912.

Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see Brooks*, 323 S.W.3d at 898–99 (characterizing the *Jackson* standard as: "Considering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt").

We measure the legal sufficiency of the evidence by the elements of the offense

as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 314 (Tex. App.—Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik*, 953 S.W.2d at 240).

A person commits an assault-by-threat if the person "intentionally or knowingly threatens another with imminent bodily injury[.]" TEX. PENAL CODE ANN. § 22.01(a)(2); *Olivas v. State*, 203 S.W.3d 341, 345 (Tex. Crim. App. 2006); *see Dolkart v. State*, 197 S.W.3d 887, 893–94 (Tex. App.—Dallas 2006, pet. ref'd). A person commits aggravated assault if he commits assault and, during the commission of the assault, he "uses or exhibits a deadly weapon." TEX. PENAL CODE ANN. §§ 22.01(a)(2), 22.02(a)(2); *Dolkart*, 197 S.W.3d at 892. Assault by threat is a "nature of conduct" offense that requires us to review the actor's conduct to determine whether he intended to cause in the victim a reasonable apprehension of imminent bodily injury. *Tidwell v. State*, 187 S.W.3d 771, 774 (Tex. App.—Texarkana 2006, pet. dism'd); *see Dolkart*, 197 S.W.3d at 893; *see also Coleman v. State*, No. 07-04-0248-CR, 2005 Tex. App. LEXIS 221, at *11 (Tex. App.—Amarillo Jan. 13, 2005, no pet.) (mem. op., not designated for publication). Assault by threat requires only fear of imminent bodily injury and does not require a finding of actual bodily injury. *Dolkart*, 197 S.W.3d at 893. It is well established that a threat need not be voiced and may be communicated by action or conduct. *Donoho v. State*, 39 S.W.3d 324, 329 (Tex. App.—Fort Worth 2001, pet. ref'd) (op. on reh'g).

8

A deadly weapon is defined as anything that in the manner of its use or intended use is capable of causing death or serious bodily injury. *See* TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (West Supp. 2010); *Tucker v. State*, 274 S.W.3d 688, 691 (Tex. Crim. App. 2008). "'Serious bodily injury' is defined as 'bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.'" *Tucker*, 274 S.W.3d at 691 (quoting TEX. PENAL CODE ANN. § 1.07(a)(46)). "The State is not required to show that the 'use or intended use causes death or serious bodily injury' but that the 'use or intended use is *capable* of causing death or serious bodily injury.'" *Id.* (quoting *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000)). It is the use or exhibition of a deadly weapon, not the identification or the name of a particular type of knife, that is an element of aggravated assault. TEX. PENAL CODE ANN. § 22.02(a)(2).

It is settled that while not every type of knife is per se a deadly weapon, any knife can—by virtue of its use—become a deadly weapon. *See, e.g., McCain*, 22 S.W.3d at 502–03. Factors to consider in determining whether a knife is intended to be used as a deadly weapon include: (1) the distance between the accused and the victim; (2) threats or words used by the defendant; (3) the size and shape of the weapon; (4) the weapon's ability to inflict death or serious injury; and (5) the manner in which the defendant used the weapon. *See Bailey v. State*, 46 S.W.3d 487, 491–92 (Tex. App.—Corpus Christi 2001, pet. ref'd); *see also Khan v. State*, No. 13-09-348-CR, 2010 Tex. App. LEXIS 10070, at *8 (Tex. App.—Corpus Christi Dec. 21, 2010, no pet.) (mem. op., not designated for publication). The actual knife used in the commission of an offense need not be introduced into evidence if a witness is able to testify about the knife and

the manner in which it was used.  *Billey v. State*, 895 S.W.2d 417, 420 (Tex. App.—Amarillo 1995, pet. ref'd).  Either expert testimony or lay testimony may be sufficient to support a deadly weapon finding.  *Bailey*,  46 S.W.3d at 492.

### III. DISCUSSION

Appellant challenges the sufficiency of the evidence that he:  (1) threatened Rojas with imminent bodily injury, and (2) used or exhibited a deadly weapon (the knife).  Specifically, appellant contends there is no evidence that he "made any gesture with the knife, came at Rojas, Sr., or did anything to imply or expressly threaten Rojas, Sr., with imminent bodily injury."  He further contends there is no evidence that he "pointed the blade of a knife in Rojas's direction."[1]  According to appellant, "[h]olding a knife is not, in and of itself, sufficient to support the aggravated assault conviction in this case."

The State responds, in part, that:  (1) appellant cites no authority for his assertion that merely holding a knife is insufficient to constitute a threat of imminent bodily injury; (2) there are many ways of holding a knife, and in certain circumstances, even revealing a knife can communicate a threat of imminent bodily injury; and (3) to prove the deadly weapon element, the State was only required to prove that the knife was used or exhibited during the assault and that its use or intended use was capable of causing

---

[1] Count Two of the indictment alleged that Baladez "intentionally or knowingly threaten[ed] Andrew Rojas with imminent bodily injury by holding or pointing the blade of a knife in his direction, and did then and there use or exhibit a deadly weapon, to-wit:  a knife, that in the manner of its use or intended use is capable of causing serious bodily injury or death, during the commission of said assault[.]"  Similarly, the jury charge included the language "by holding or pointing the blade of a knife in the direction of Andrew Rojas, Sr. . . . ."  The State, citing *Gollihar v. State*, 46 S.W.3d 243, 257 (Tex. Crim. App. 2001), argues that any variance between the indictment and the proof resulting from the additional language "by holding or pointing the blade of a knife in the direction of Andrew Rojas, Sr." was an immaterial variance.  *See id*; *see also Sanchez v. State*, No. 13-07-00461-CR, 2009 Tex. App. LEXIS 3922, at **8–10 (Tex. App.—Corpus Christi June 4, 2009, pet. ref'd) (mem. op.) (holding, in aggravated assault-by-threat case, that addition of "by threatening to kill" language in indictment was an immaterial variance and should not be included in the hypothetically correct jury charge in legal sufficiency review).  As explained more fully below, because we find the evidence sufficient to support appellant's conviction, we need not address the State's argument.  *See* TEX. R. APP. P. 47.1.

10

serious bodily injury. The State further argues that the record shows "that a visual demonstration was made to the jury of how [appellant] threatened Mr. Rojas with the knife." Alternatively, the State argues that it met its burden under a hypothetically correct jury charge because the manner and means alleged was not essential to the offense.

## A. Deadly Weapon

Rojas testified that the knife appellant was using in attempting to pry open the lock on the storage shed was "about 12 inches long." When appellant turned toward Rojas—still holding the knife—his voice "changed" and he denied that he was "do[ing] a fucking thing." An intent to inflict serious bodily injury or death may be shown by evidence of assertive conduct by an attacker. *Ortiz v. State*, 993 S.W.2d 892, 894 (Tex. App.—Fort Worth 1999, no pet.). Rojas testified that the knife placed him in fear of imminent bodily injury. Appellant did not release the knife until Rojas wrestled him to the ground and then continued to try to reach for the knife while wrestling with Rojas. The knife was introduced in evidence and the jury had an opportunity to examine it. *See Alvarado v. State*, 317 S.W.3d 749, 753 (Tex. App.—Beaumont 2010, pet. ref'd) ("Because the knife was admitted into evidence, the jury could determine whether the knife was capable of inflicting serious bodily injury by examining the object."). The knife, which we have also examined, is thirteen inches long with an eight-inch blade and a five-inch hard plastic handle. The blade is slightly curved with a sharp point and a serrated edge. *See id.* (noting that "even casual observation of the five-to-six-inch blade on Alvarado's knife reveals that if wielded during an assault, the knife is capable of causing serious bodily injury or death"). Officer Martinez testified that the knife was

11

capable of causing serious bodily injury and was an effective knife for cutting and stabbing. We therefore conclude that a rational trier of fact could have found that appellant used or exhibited a deadly weapon based upon the evidence presented to the jury at trial. *See Jackson*, 443 U.S. at 319.

**B. Threat**

Appellant also contends that the evidence is legally insufficient to support the finding that he threatened Rojas with imminent bodily injury. We disagree.

At trial, Rojas re-enacted how appellant reacted when Rojas approached him:

| Q [Prosecutor]: | Okay. And if you would, please, show me—if you can move over here to the wall—exactly what he was doing with the knife using State's Exhibit 13 [the knife]. |
|---|---|
| A [Rojas]: | Well he got the knife in between the door and try [sic] to—I don't know he had it either this way or this way. I'm pretty sure it was this way trying to open it up. |
| Q: | Okay. |
| A: | And when I showed up— |
| Q: | Did you show up over here? |
| A: | Right. |
| Q: | And what did he do with the knife then? |
| A: | He stopped right there. |
| Q: | Okay. And what did you say to him? |
| A: | I said "What are you doing?" |
| Q: | Okay. And what did he say back? |
| A: | He said I don't do nothing [sic]. |
| Q: | Okay. |

12

A:     And I said what do you mean you don't do nothing? You try to open the door. That's what you trying to do.

Q:     And what he did say or do to that?

A:     And then he changed—he changed the voice.

Q:     He changed his voice?

A:     He said[, "] I told you I didn't do a fucking thing[,"] and he turned around like that.

Q:     Okay. Now at that time[,] are you standing about as far from him as I am—

A:     Yes.

Q:     —from you?

A:     Right.

Q:     Okay. When he did that like that to you, were you in imminent fear that he might cause you harm?

A:     Yes.

Q:     Okay. And when I mean "harm," some kind of pain, bodily injury?

A:     Uh-huh.

Q:     So what action did you take? Let's change positions, okay?

A:     Okay. I just grabbed his hand like that.

Q:     Okay. And then what did you do?

A:     I try—we were wrestling.

In conducting a sufficiency review, we presume that undescribed courtroom demonstrations supported the jury's verdict. *See Rogers v. State*, 756 S.W.2d 332, 336

13

(Tex. App.—Houston [14th Dist.] 1988, pet. ref'd) (noting that undescribed testimonial gestures undoubtedly had a significant impact on the jury's assessment of exactly how appellant held his hand during the robbery); *see also Morales v. State*, 293 S.W.3d 901, 909 (Tex. App.—Texarkana 2009, pet. ref'd) (holding that, as appellate court, it was "constrained to defer to the jury's findings, based on its observation of the gestures and demonstrations at trial" which were "not transcribed and which we cannot see"); *Cornett v. State*, No. 13-03-036-CR, 2004 Tex. App. LEXIS 3385, at *17 (Tex. App.—Corpus Christi April 15, 2004, no pet.) (mem. op., not designated for publication) (noting that jury could have concluded that defendant acted threateningly where jury saw demonstration of how defendant held a knife); *Johnson v. State*, No. 14-99-00968-CR, 2001 Tex. App. LEXIS 4963, at *13 (Tex. App.—Houston [14th Dist.] July 26, 2001, no pet.) (mem. op., not designated for publication) (noting that testimony that knife was "about this long (indicating)" and "about this big, wide (indicating)" undoubtedly had significant impact on jury's assessment of the size of the knife and whether State proved the knife was a deadly weapon).  A threat may be communicated by action or conduct.  *See Donoho*, 39 S.W.3d at 329.  "The mere presence of a deadly weapon, under proper circumstances, can be enough to instill fear and threaten a person with bodily injury."  *Tidwell*, 187 S.W.3d at 775.  Here, Rojas demonstrated for the jury that appellant "turned around like that" and also demonstrated the physical distance between himself and appellant.  Rojas testified that when appellant "did like that to [him]," he was placed in imminent fear of bodily injury.  We are "constrained to defer to the jury's findings, based on its observation of the gestures and demonstrations at trial", which were "not transcribed and which we cannot see."  S*ee Morales*, 293 S.W.3d at

14

909. Thus, even if the State was required to prove that appellant threatened Rojas by "holding or pointing the blade of a knife in [Rojas's] direction," we would assume that Rojas demonstrated to the jurors that appellant pointed the knife in his direction. *See id.; Rogers v. State*, 756 S.W.2d 332, 336 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd). We find the evidence to be legally sufficient to allow a rational trier of fact to find that appellant used a knife to intentionally or knowingly threaten Rojas with death or serious bodily injury. *See* TEX. PENAL CODE ANN. § 22.01 (a)(2); *Olivas*, 203 S.W.3d at 345.

## IV. CONCLUSION

We overrule appellant's sole issue and affirm the trial court's judgment.

_____
DORI CONTRERAS GARZA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
14th day of July, 2011.

15